Mr. Flowers comes here on a habeas corpus seeking a writ based on the prosecution's suppression of a 700-page investigative file implicating its star witness and complaining witness, alleged victim, Anthony Kaos Perry, in a murder the night before a trilogy of shootings occurred in L.A. which gave an altered explanation of the murder. I would like to start by identifying four important facts before moving on to the standard of review which will govern this case. One, it's important to note that there were two trials during which time the government and the state suppressed this evidence. The first trial ended in a deadlock. That trial, Mr. Perry, the witness, Kaos, implicated Mr. Flowers as the shooter in a December 25th shooting and a January 3rd shooting. The second trial came close to deadlock. After two days of deblurations, a substitute juror was put in and the jury returned a guilty verdict. During that trial, Mr. Perry had retracted and recanted his identification of Mr. Flowers. The second important fact for the court to note is the government's theory of trial. They had a domino theory. Basically, there was a gangland murder of Big Fly Johnson which set off a gang war between the Greer Street Crips, a predominantly African-American gang, and 18th Street, a predominantly Hispanic gang that shared territory in Los Angeles. And the government's theory was, in essence, in retaliation for Big Fly's murder, my client, Nate Flowers, tried to kill Mr. Perry on December 25th, Christmas Day. Having failed to accomplish that end, saw him again on the 3rd of January, took a second attempt, failed again. Mr. Perry at that point was taken to custody on an outstanding robbery warrant and then not being able to locate Mr. Perry. He shot at any, according to the government, any 18th Street members, being Mr. Carmona and Mr. Fells on February 3rd. The third important fact for the court to recognize is the timing of the disclosures to chaos. The prosecution well knew that Mr. Perry would lose his cooperative posture if they let him know that he was a suspect in the Big Fly murder. So about five days, they withheld from him that he was being investigated for Big Fly's murder, despite the fact that he had provided an alibi for that, until right after he had testified in the first trial but before the jury deadlocked. So the prosecution knew the second they alerted him to the fact that he was a suspect, that his plan to deflect attention had failed, he would retract or dummy up or take five or do something, and that's exactly what he did. The fourth fact, one guilty against materiality, talking about this trial. Remember that the prosecution started this case, their summation, we don't suppress evidence, we don't hide evidence. But in this case, that was false. They had suppressed the 700 page file. So we're here under AEDPA claiming a Brady violation. And it was direct review, de novo review, the question would be, is there a reasonable probability that there'd be a different result, that one juror in this trial that hung once and almost hung a second time would change his vote. But because of two facts, we're on de novo review here, we're not on AEDPA review. One, the State Court of Appeals said that Mr. Flowers did not claim that this was exculpatory material. And they limited their analysis to as it was impeachment material under Giglio, but they refused to consider whether it was exculpatory because they said Mr. Flowers didn't make that claim. And that was an unreasonable determination of facts and it was false. The Court of Appeals opinion cites four times that it's reviewing an appeal of a new trial motion. A new trial motion you'll find on page 61 and 138 of your excerpts. It says it's a motion for new trial based on the suppression of exculpatory evidence. Moreover, in his opening brief, the substance of his argument was, if this evidence was introduced, it would give an alternative explanation for the December 25th shooting. It never occurred. There was no December 25th shooting. Perry was shot on the 24th when he killed Big Fly. He was killed in retaliation. He was shot in that gunfight. So he lied about the 25th and he lied. Excuse me. The 25th never occurred. The domino theory never occurred. And so it exculpates him because it changes the theory of prosecution. Well, what specific Brady material are you pointing to? The Brady material would be the investigative file. The statements of Echo Joiner saying that he had heard that Big Fly was murdered by Perry. The eyewitness account of Errol Baby Sandman Myers who said he witnessed it and saw Perry kill Johnson and witnessed a wild gunfight with Krip Kow and Willie Vasquez and Perry involved with Krip Kow shooting at Willie and Perry. And you'll find this at page 184. You're saying that none of that was disclosed? None of it. Not the entire file? The entire file. There was another statement by a man named LaBelle Coates. Did they ever give an explanation as to why they didn't disclose it to the defense? Yes, they did. What happened was when after Coates had made his statements and before Myers did when Coates and, excuse me, Joiner had made statements to the police implicating Perry, the prosecution went to basically a presiding judge named Kellogg and asked for his blessing not to provide it. And they didn't tell him about Joiner. They only told him about Coates. And they said it was unrelated. And the judge said, well, there's no nexus between these shootings. You don't have to give it up. Now, the California Court of Appeals found that was incorrect. And that finding is entirely different. And that's because, one, they withheld Coates. And they also later on found Myers who gave an eyewitness account, which corroborated everybody. They actually lied to Judge Kellogg. They told Judge Kellogg there was nothing to corroborate Coates while withholding Joiner, which did corroborate Coates. And that issue has been resolved, so there is no doubt suppression. But the entire file that implicated Perry, the star witness, was taken away. Now, how – if this had been disclosed before the second trial, how would you have – how would defense counsel have used it at the second trial? What would have been different in – because a lot of it is not admissible evidence, it seems to me. I don't see how you would get most of what's in that file into evidence at the second trial. Well, but, one, you could have examined Flowers – Perry on it. Two, you had an eyewitness account, so that's absolutely – Well, if you examine Perry – and remember, at this point, the government is trying to impeach Perry at the second trial, yes? Yes and no. They were both impeaching him. Both sides were – he was a liar, and both sides were impeaching the account dated in life. With the government saying, though, that his original testimony was correct. Right. And what was missing – And you're saying, no, he's just a thoroughgoing liar. No, that this – what it goes, it gives the explanation why he recanted. It shows that he was trying to curry favor with the police. He had a personal vendetta with Flowers. He implicates Flowers. He makes up this 25th story to deflect that he killed Big Fly. And it would explain to the jury that once he realized that, oh, my God, all this work I've done with this detective has failed, I'm not going to help the government anymore. This didn't work. That would explain why he falsely implicated Flowers, and the jury would have had an understanding. There was two competing views about why he recanted, but none was the truth. And that was because it was withheld from us. The last point I make before I try to save two minutes, because I know Judge O'Scallion is tight on the clock, is besides failing to identify it as exculpatory material, we've identified five facts that were material that the Court of Appeals found that were false. They said there was no evidence that Perry could have been shot on the 24th during Big Fly, and that's not true. Myers describes a gunfight at page 184. He has a gunfight with Crip Cows shooting at them, Willie and Perry. So he could have been shot in that wild gunfight. That's not for an inference. They said there was nothing to support an inference. The Court of Appeals thrice said that the store clerk testified. Three times they say the store clerk testified that Perry said the same guys are after me on January 3rd, so giving credence to the December 25th hearing. The store clerk denied in both trials he ever said that, and he never used the word same. The cop said he said that some guys are after me, but he never used the word same, so they made up that fact. You're down to less than a minute and a half, counsel. Okay. The rest of the facts that we claim for de novo review in our brief, I'll save the rest for rebuttal, and I thank you, Your Honor. Very well. We'll hear from the State. Good morning, Your Honors. May it please the Court. My name is Kathy Pomerantz, Deputy Attorney General. I'm here on behalf of Respondent Appali Scott, Warden Scott McEwen. Of course, you've read our brief, so you know that our position in this is, of course, that the District Court properly found that the California Court of Appeal denied Petitioner's Brady claim and that it was a reasonable denial. I want to address a few things that were brought up by opposing counsel. Well, is this Brady material or not? We hold that it's not Brady material. I mean, ultimately, this case is going to turn on materiality. Hasn't it been determined that it's Brady material? I thought that was not an issue any longer in the appeal. The Court of Appeal found that it had limited impeachment value. I would also argue that while the Court of Appeal did say that Petitioner had not called it exculpatory material, I think the Court of Appeal, in its opinion, actually did address the exculpatory value of some of it. When they said it had limited impeachment value, they were saying it was Julio material, but simply not in the context of everything that important. So it wasn't that they were saying it wasn't a Brady violation. They were saying that it wasn't material. But how can that be? You think that, first, the fact that, in the government's view, he committed a murder would not have been material? Second, if I understand defense counsel's theory, it was the very fact that this material was disclosed to the witness after the first trial that was their explanation for why he changed his story, different from the government's explanation. So did it not go to the heart of what was one of the biggest issues in this case, which is why he changed his story? I mean, I think, obviously, there was the government's theory that he changed his story because he was about to get out of prison. Yeah, that was their theory, but they would have liked to have had this ammunition to rebut that theory, saying, oh, no, what happened was he learned. We just learned about this after the second trial. The government, in its wisdom, didn't think it was even worth telling us about the fact that he was, in the government's view, a murderer. But he learned about it after the first trial, and that's when he changed his story. That's a totally different theory of why he changed his story, which they could not explore because they didn't have this material. Well, I think one thing that's interesting that was overlooked about this material is had this – again, I don't even know how this information would have been admitted at trial. I think in California, you're allowed to use – He could have been asked the question. He was on the stand, yes? He was on the stand. Isn't it true that you first learned about this after your testimony at the first trial? And he would have either said yes or no. If he had said no, the government would have been obligated to correct him. So it would have come out that the answer was yes. And then you could have put the question to him or just argued to the jury. That's why he changed his story because he was making this up the first time to get cooperation credit. Once he learned that he was still under investigation, he said to hell with that. I'm not going to cooperate anymore, a very different theory from the one that the government was raising. Correct. I also – I want to point out, though, a piece of this information. Had this information come in that he was a suspect in the Big Fly murder on December 24th, I think that that information only would have hurt Petitioner's case even more. The record demonstrated that Big Fly and Petitioner were close friends, that after Big Fly was murdered, Petitioner was seen wearing a T-shirt with Big Fly's picture on it in memoriam to his good friend. I think if it were true that Perry was the one who shot Big Fly on the 24th, that only gives Petitioner more motive to go out and immediately shoot him on the 25th, right after the Big Fly murder, and then again on January 3rd. So in all honesty, I think that information would have really hurt the defense and probably would not have come in because of that. And you also have – Well, you're not saying it wouldn't have come in. You say that it would have been a strategic decision for them. A strategic decision, correct. But the – I don't see how that's the government's choice, so to speak. I mean, they have maintained at all times that they would have used it. Right, but I don't think the defense would have wanted that information to come in. Well – Not to mention – You don't think it would be helpful to the defense putting aside all the nuances of the motive to bring out that the witness who the government was relying on, even though they had to rely on his testimony from the earlier trial, was a murderer. You don't think that would have infected the jury's views? I don't think so. Given the history that he had, he had been a gang member for a long time. Yeah, I saw that in the Court of Appeals in the state decision, and I found it very strange. Oh, it's the – the claim is, yeah, he's a bad guy. He hangs around with gangs. He's been involved in bad situations. So the fact that he's a murderer, oh, that's just incidental, secondary, immaterial information. Give me a break. How could that be? Well, I mean, you have a gang expert testimony talking about the nature of the crimes that occur between these gangs, how murders are quite often perpetrated. Just another everyday murder? I mean, I think in a sense, unfortunately, that's almost what it becomes. I mean, you wrong my gang, I'm going to come out and I'm going to show you. He wasn't accused of any other murder, was he? He was not. He was in prison on a robbery charge which came out, and this information about him having a green light on his head which basically was he could be taken out at any time. So, of course, another reason why maybe he changed his story the second time around and decided that he didn't want to implicate Petitioner because he knew that he was going to die if he did. So it can go either way. But, I mean, at the end of the day, it all fails on the materiality element because Brady is a law of broad application and the state is giving a lot of leeway in applying it. And given the extensive impeachment of Perry that occurred at the trial and the existence of other evidence tying Petitioner to the crimes, we have Carmona who testified at trial who also identified Petitioner right after the February shooting, identifying Petitioner. He never wavered in that identification. So we have Carmona putting Petitioner at the February 5th shooting. We have the gun, the ballistics evidence. So we have the 9-millimeter casings from the January 3rd shooting and the 9-millimeter casings from the February 5th shooting, and there's testimony that they were fired from the same gun.  Whoever shot at the January 3rd shooting probably did the February 5th shooting. So we have that as well. We also wanted to discuss Paul Allen, who is the store clerk. His testimony, and I know Petitioner brought this up as one of the mistakes that the Court of Appeal made. There was testimony in the record from the officer who interviewed Allen, the store clerk, and Allen told Officer Enquist that Perry had been in the store, he went to buy some cigarettes, he said he had been shot a week before, and he said people were after me. And while it is true that the Court of Appeal added the word same and mistakenly identified that testimony as coming from Allen, and I think they said Allen testified, that to me is not a mistake. The Court of Appeal was not directly quoting Allen as having said that. By saying the same people were after me, the Court of Appeal was making that inference. And it makes sense. Why would Perry say I got shot a week before, people are after me? It only makes sense to draw the conclusion that it's the people that shot him before that are now after him. So I don't think that that was such a fatal flaw. It was perhaps a misstatement, but certainly more reflective of the Court of Appeal's inference that was drawn from that testimony. So there's that testimony as well that ties Petitioner to the January crime. And of course we have the phone call that Petitioner made right after he was arrested where he discusses how he's been accused of attempted murder and talks about how Perry has said that he shot him in the calf. At this point, the police know nothing about this crime. This is in March. The police didn't know about Perry being shot in the calf until August. So the only way that Petitioner could have known that Perry was shot in the calf is if Petitioner did it himself. So that certainly revealed a lot in that phone call in and of itself. So based on all the material, again, that ties Petitioner to the crime, and the extensive impeachment evidence, we believe the district court properly found that the California Court of Appeal's denial of this Brady claim was reasonable and respectfully request that the court affirm the district court. Thank you. Thank you, counsel. Your time has expired. Thank you. Mr. Ballack, you have some reserve time. Thank you, Your Honor. I'll be brief as I must. It comes down to the standard of review, I think, and I think we get de novo. I would ask the court to take a close look at our reply brief, which really sets out the material misstatements of fact. My colleague is wrong. The Court of Appeals thrice said that Allen, quote, testified to facts he denied under oath. He impeached the officer. They cite that Carmona identified my client. Mr. Fels said he could see the shooter at the same time they were shooting at Carmona and said he wasn't in the courtroom. The Court of Appeals then says Mr. Fels testified, well, if he was in the courtroom, he wouldn't identify him. That is false. At the second trial, Carmona, Fels said, if he was here, I'd identify him. That's not the man. He got a good look at him. Carmona's eyewitness testimony was shaky. He said he wore glasses. He wasn't wearing them. The jury asked for a readback twice of it. He was making a cross-racial ID in a matter of seconds under a period of immense stress being shot at. This was a very close case. This was a weak case. This evidence made a difference. The last thing I'll note is we made a mistake, and I'll admit it. There's an issue about when Perry said that he was shot in January. It wasn't August. And take a look at the August interview, page 290 and 291 of our excerpts. The police officer is the one that tells Perry he was shot in December. The police officer tells Perry he was shot on December 25th. Obviously, there was a conversation before that, but when that conversation was before then for the officer to have pulled out December, December 25th, is unclear from the record. In any case, Mr. Flowers below, the trial counsel, disputed their account of what that phone call said. The phone call was barely audible, and they said that's not what he said. And so their case was the same. On de novo review, this is an easy case. We'd ask you to reverse and grant the writ. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: Rakoff, O'SCANNLAIN, RAWLINSON